NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

| | |
|---|---|
| In the Interest of I.N., a child. | ) |
| _____ | ) |
| | ) |
| E.N., | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| | ) |
| v. | )  Case No. 2D17-1066 |
| | ) |
| DEPARTMENT OF CHILDREN AND | ) |
| FAMILIES, GUARDIAN AD LITEM | ) |
| PROGRAM, and K.O., | ) |
| | ) |
| Respondents. | ) |
| _____ | ) |

Opinion filed August 23, 2017.

Petition for Writ of Certiorari to the Circuit
Court for Collier County; Mary C. Evans,
Judge.

Susan M. Bodden and Alexander Peterson
(withdrew after briefing) of Family First
Legal Group, Naples; Susan M. Bodden of
Bodden Law Firm, Mediation & Arbitration,
Naples (substituted as counsel of record)
(withdrew after briefing), for Petitioner.

E.N., pro se.

Meredith K. Hall, Bradenton, for
Respondent Department of Children and
Families.

Sara E. Goldfarb, Sanford, for Respondent
Guardian ad Litem Program.

Beverly L. Brennan, Naples, for
Respondent K.O.

BLACK, Judge.

E.N., the Mother of the minor child, I.N., petitions for certiorari review of the Order on Mother's Motion for Evidentiary Hearing Prior to Reunification, which appointed a reunification therapist and directed the parties to follow the therapist's directives about how reunification between I.N. and K.O., the Father, should be initiated and implemented. Because the order departs from the essential requirements of the law and causes irreparable harm, we grant the petition and quash the order on review.

## I. Background

After I.N.'s birth in 2011, the Mother and the Father, who were never married, ended their relationship. The Mother and the Father shared custody of I.N. equally until I.N. was sheltered from the Father in January 2015. About a month later, the Department of Children and Families filed a petition for the dependency of I.N. solely as to the Father. The petition alleged that I.N. had been sheltered due to the Father's alleged sexual abuse of I.N.'s "half siblings." The "half siblings" were the Father's girlfriend's two children, who had been living with the Father, the girlfriend, and I.N. when I.N. was in the Father's custody.[1]

The Father denied the allegations in the petition but consented to I.N.'s dependency. I.N. remained in the Mother's care, and the Father initially had supervised

---

[1]Unrefuted testimony at the evidentiary hearing concerning reunification established that I.N. lived with these children and referred to them as her siblings. See § 39.01(73), Fla. Stat. (2016). We will refer to them throughout this opinion as I.N.'s siblings.

visits with I.N. twice a week. But the visits were halted when I.N.'s treating psychologist, Dr. Mary Ellen Frazier, wrote a letter indicating that I.N. demonstrated anxiety and engaged in hypervigilant and aggressive behavior after visiting the Father. I.N. had indicated in therapy sessions that she did not want to visit the Father and consistently avoided the topic of the Father. In Dr. Frazier's opinion, supervised visitation between the Father and I.N. was not in I.N.'s best interest at that time. The dependency court entered a no contact order, and prior to the entry of the order on review, the Father had not seen I.N. since March 2015.

The Father was given a case plan with a goal of reunification. The case plan required that the Father complete a comprehensive behavioral health assessment and follow all recommendations; complete a forensic psychological assessment and follow all recommendations; complete a mental health assessment and follow all recommendations; participate in random drug screens twice a month and be clean of any substances; complete a substance abuse evaluation and follow all recommendations; and complete parenting education classes. Although the case plan originally included a psychosexual evaluation, this task was changed to a forensic psychological assessment at the Father's request due to pending criminal charges against the Father based on the alleged sexual abuse of I.N.'s siblings.[2]

---

[2]On March 2, 2015, the State brought criminal charges against the Father. The State charged the Father with three counts of capital sexual battery of a child less than twelve, one count of lewd or lascivious conduct, and two counts of lewd or lascivious molestation with respect to one of I.N.'s siblings. About a year later, the Father pleaded no contest to two counts of child neglect. See § 827.03(2)(d), Fla. Stat. (2014). The other charges were nolle prossed. In accordance with his plea agreement, adjudication was withheld and the Father was sentenced to six months' county jail followed by four years' probation on one count and to a consecutive two years' probation on the second count.

Following resolution of the criminal proceedings and after the Father was released from jail, he sought reunification. The Mother filed a motion for evidentiary hearing prior to reunification to determine if reunification was in I.N.'s best interest. A hearing was held over three days in November 2016 and January 2017.

At the hearing, Dr. Frazier testified that she provided therapy to I.N. between January 2015 and April 2016. Due to I.N.'s age, Dr. Frazier primarily engaged in play therapy with I.N., but she had conversations with I.N. to the extent tolerated by I.N.

Dr. Frazier testified that I.N. had been experiencing behavioral problems, including aggressiveness with peers, sleep disturbances, discomfort with herself, intense avoidance of the topics of the shower—where the alleged sexual abuse occurred—and of the Father, hypervigilant behavior, and behavior that Dr. Frazier described as being frequently employed by children for relief of anxiety caused by exposure to sexual activity beyond their developmental stage. Dr. Frazier diagnosed I.N. with posttraumatic stress disorder (PTSD), with the Father being the trigger for her symptoms.

Dr. Frazier explained that as I.N. became more comfortable in therapy, she began to talk about some of her experiences in the Father's home. She reported that the Father washed her and her siblings "inside out" and that they all took turns washing the Father "as far up as they could reach." It was apparent that I.N. was uncomfortable talking about these incidents. I.N. also reported that the Father would cuddle with her while naked and that he was frequently naked. Although I.N. was too

young to discuss the difference between the truth and a lie, Dr. Frazier found her to be "believable and credible."

As a result of the information that came out during therapy, Dr. Frazier wrote a letter to the court, which was introduced into evidence at the hearing. In the letter, Dr. Frazier advised the court that new information had come to light that showed that I.N. had not merely tangentially experienced these incidents but that she had individually experienced them. Dr. Frazier explained that I.N.'s status changed "from just having observed perhaps something happening to other children to actually experiencing what happens not only to the other children, but to herself and the absorption of that stress and trauma of the experience."

Dr. Frazier testified that from a clinical standpoint, I.N. "credibly talked about things that were sexually developmentally inappropriate that she experienced both personally and observationally." Based upon what I.N. told her about her experiences, Dr. Frazier believed that I.N. was a victim of inappropriate sexual behavior by the Father, which caused her PTSD. I.N.'s symptoms were at their worst when I.N. was having supervised visits with the Father. Once visitation stopped, the symptoms improved with therapy.

Although Dr. Frazier testified that having no contact with the Father was necessary during the early stages of I.N.'s treatment, she did not have an opinion about whether I.N. should have contact with the Father at the time of the hearing. But she testified that if I.N. were exposed to the Father, that contact would trigger I.N.'s PTSD symptoms for a period of time. If the court decided to permit reunification, I.N. would probably need counseling again to help her cope with the symptoms.

Dr. Robert D. Silver, a licensed psychologist, testified that he performed a psychological evaluation of the Father. Dr. Silver described the Father as trying to portray that he was a normal person without pathological tendencies and prove that the sexual abuse allegations were simply misunderstandings about innocent behavior. The Father declined to answer Dr. Silver's questions about the alleged sexual abuse, as the Father's criminal case was pending at the time. The Father also declined to undergo a psychosexual evaluation.

Dr. Silver testified that sexual abuse of children is "highly persistent and recurrent, and remains a lifelong possibility," such that if the Father did engage in sexual behavior with a child, he would pose a substantial and continual risk to that child. Dr. Silver explained that if it were found that I.N.'s siblings had been sexually abused by the Father, I.N. would also be at risk for sexual abuse. Dr. Silver stated that if the allegations of sexual abuse were supported, the Father's contact with I.N. should cease for her protection and the Father should participate in treatment to address his psychosexual proclivities. Dr. Silver further explained that "grooming is a pattern of behavior individuals who sexually abuse children use to try to make the child comfortable with the abuse by engaging in small steps of sexual behavior." Cuddling naked with a child and routinely showering with a child could be, but are not necessarily, examples of grooming.[3]

In Dr. Silver's opinion, the Father's "alleged sexual behavior could not be explained by [his] having psychopathology such as being depressed, [or suffering from] manic depress[ion], schizophreni[a], [or] a personality disorder." The only other

[3]The Father admitted to Dr. Silver that he routinely showered with I.N.

possible explanation for the alleged behavior would be sexual deviation, but Dr. Silver had insufficient information to reach a conclusion about that. Such a conclusion would require Dr. Silver to evaluate information from other sources about observed inappropriate sexual behavior by the Father. His ability to evaluate the Father for sexual deviance was also limited by the Father's refusal to complete a psychosexual assessment.

The guardian ad litem (GAL) testified at the hearing. Based upon the reports generated by the child protection team, Dr. Frazier's testimony, and the other information the GAL learned at the various hearings in the case, she did not believe it was in I.N.'s best interest to have contact with the Father. She did not believe there should be contact until a psychosexual evaluation had been performed on the Father and she had received some assurance that there would be no detriment to I.N. if she had contact with the Father.

Likewise, the case manager testified that reunification was not in I.N.'s best interest. She believed that I.N. would be at risk of sexual abuse if reunified with the Father. When I.N. was in contact with the Father, she displayed concerning behaviors. Since that contact was eliminated, I.N. had improved immensely and had not demonstrated any behavioral issues.

The case manager testified that the Father had completed his case plan tasks. And although she was not aware of the Father displaying any behavior that showed that he had not benefited from his case plan tasks, she did not believe that the tasks addressed the allegations that caused I.N. to be sheltered. She recommended that the Father undergo a psychosexual evaluation. She believed that a psychosexual

evaluation was necessary to determine whether the Father should have contact with I.N. because it would indicate the risk to I.N. and the Father's risk of violating his probation. She could not say that the Father had actually benefited from services when the services provided did not address the allegations of sexual abuse.

The Mother testified that she began to notice concerning behavior in I.N. in August 2014. I.N. became increasingly afraid of and resistant to going to the Father's house. Once, when the Mother told I.N. that she was going to see the Father the next day, I.N. punched her in the face. I.N. would refuse to get into the car if she knew that she was going to the Father's house. When I.N. talked about the Father, she would lower her voice and get teary-eyed. I.N. had begun picking her lips until they bled and having nightmares about monsters coming after her. The Mother testified that I.N.'s behavior had improved but that she still had nightmares. The Mother did not believe that contact between the Father and I.N. was appropriate or in I.N.'s best interest. She believed that the Father had sexually abused I.N. and her siblings, and she was concerned for I.N.'s safety.

The Father testified that he believed it was in I.N.'s best interest to resume contact with him. He could not understand why contact with him would not be good for I.N. He disagreed with Dr. Frazier's diagnosis that I.N. had PTSD as a result of trauma caused by him, but he indicated that he would follow the therapist's advice regarding reunification. He stated that he understood that reunification might be difficult for I.N. because she had not seen him in two years.

Following the hearing, the dependency court entered a written order appointing a reunification therapist and ordering the parties to begin reunification

therapy. Thereafter, the Mother filed a petition for certiorari review of the dependency court's order.[4]

## II. Discussion

"There is generally no right to review by appeal of nonfinal orders in child dependency proceedings. However, common law certiorari provides a remedy under appropriate circumstances . . . ." A.A. v. Dep't of Children & Families, 147 So. 3d 621, 623 n.2 (Fla. 3d DCA 2014) (citations omitted). "Certiorari review of a nonfinal order is limited to errors that constitute a departure from the essential requirements of the law, causing irreparable injury, for which there is no adequate remedy on direct appeal." Dep't of Children & Families v. W.H., 109 So. 3d 1269, 1270 (Fla. 1st DCA 2013) (quoting A.W.P. v. Dep't of Children & Family Servs., 10 So. 3d 134, 135 (Fla. 2d DCA 2009)).

The effect of the order at issue is to grant reunification and to begin the reunification process in accordance with the recommendations of the reunification therapist. Cf. J.C. v. Dep't of Children & Family Servs., 83 So. 3d 883, 887-88 (Fla. 2d DCA 2012) ("The order, which has the effect of prohibiting the grandfather from residing with his wife, results in an injury that cannot be remedied on postjudgment appeal." (emphasis added)). The potential harm to I.N. from that reunification cannot be undone by direct appeal. Therefore, we must determine whether the dependency court's order departs from the essential requirements of the law.

### A. The applicable law on reunification

---

[4]This court on its own motion stayed all actions directed by the order on review until further order of this court or final disposition of this proceeding.

At the time the dependency court considered the request for reunification in this case, the law required that the court consider the parent's compliance with the case plan, whether reunification would be detrimental to the child, and whether reunification would be in the child's best interest.  See § 39.522(3), Fla. Stat. (2016); see also W.H., 109 So. 3d at 1270.  The version of section 39.522(3) applicable for our review in this case provided:

> In cases where the issue before the court is whether a child who is placed in the custody of a parent should be reunited with the other parent upon a finding of substantial compliance with the terms of the case plan, the standard shall be that the safety, well-being, and physical, mental, and emotional health of the child would not be endangered by reunification and that reunification would be in the best interest of the child.

Id. (emphasis added).[5]  Prior to July 1, 2013, courts were required to grant reunification absent a finding of endangerment if the parent seeking reunification had substantially complied with his case plan.  T.N.L. v. Dep't of Children & Families, 132 So. 3d 319, 323 (Fla. 4th DCA 2014).  However, the 2013 amendment to section 39.522, which added subsection (3), elevated the best-interest determination to a status at least equal to that of the question of endangerment.  Id. at 324.  Thus, a court may deny reunification if it is not in the child's best interest even if the court does not find that reunification would endanger the child.  Id.; see ch. 2013-21, § 3, at 216, Laws of Fla.

---

[5]Effective July 1, 2017, the text of section 39.522(3) has been amended. Now, "upon a finding that the circumstances that caused the out-of-home placement and issues subsequently identified have been remedied to the extent that the return of the child to the home of the other parent . . . will not be detrimental to the child," the court must determine "that the safety, well-being, and physical, mental, and emotional health of the child would not be endangered by reunification and that reunification would be in the best interest of the child."  § 39.522(3), Fla. Stat. (2017); see ch. 2017-151, § 13, at 26-27, Laws of Fla.

Further, in any decision concerning a parent's request for reunification, the dependency court is required to address the "best interest" factors in its written order:

> (a) The compliance or noncompliance of the parent with the case plan;
>
> (b) The circumstances which caused the child's dependency and whether those circumstances have been resolved;
>
> (c) The stability and longevity of the child's placement;
>
> (d) The preferences of the child, if the child is of sufficient age and understanding to express a preference;
>
> (e) The recommendation of the current custodian; and
>
> (f) The recommendation of the guardian ad litem, if one has been appointed.

§ 39.621(10).[6]

Orders granting reunification in the absence of written findings addressing the best interest factors have been held to constitute a departure from the essential requirements of the law. A.A., 147 So. 3d at 623; W.H., 109 So. 3d at 1270; see also Guardian Ad Litem Program v. Dep't of Children & Families, 143 So. 3d 1075, 1077 (Fla. 2d DCA 2014) (quashing order of reunification when the dependency court failed to make any oral findings related to the child's best interest at the evidentiary hearing and the written order failed to include a finding that modifying placement was in the child's best interest; nothing in the record evidenced the court's consideration of the child's best interest in modifying placement). Orders granting reunification which are not supported by competent substantial evidence also constitute a departure from the

---

[6]Effective July 1, 2017, the best interest factors have been renumbered from subsection (10) to subsection (11) of section 39.621. Ch. 2017-151, § 18, at 31, Laws of Fla. The factors themselves have not changed.

essential requirements of the law.  M.N. v. Dep't of Children & Families, 120 So. 3d 3, 6 (Fla. 1st DCA 2012); cf. E.H. v. Dep't of Children & Family Servs., 979 So. 2d 363, 364 (Fla. 2d DCA 2008) (granting petition for writ of certiorari where supervised visitation order was not supported by competent substantial evidence).

Here, the dependency court's failure to expressly determine not only whether I.N. would be endangered by reunification but also whether reunification was in I.N.'s best interest was a departure from the essential requirements of the law.  The court also departed from the essential requirements of the law because, while its written order addresses the best interest factors of section 39.621, its findings are not supported by competent substantial evidence.

**B.  The dependency court's order**

In its order, after noting the then-applicable requirements of section 39.522(3), the dependency court addressed the best interest factors.  Under the circumstances of this case the most pertinent factors are (a), (b), (e), and (f), and thus we focus on the evidence as to each of those factors.

First, the dependency court concluded that the Father had complied with his case plan because he completed the tasks therein.  See § 39.621(10)(a).  However, the court did not address this factor in conjunction with the then-applicable language of section 39.522(3), requiring a finding of "substantial compliance with the terms of the case plan."  " 'Substantial compliance' means that the circumstances which caused the creation of the case plan have been significantly remedied to the extent that the well-being and safety of the child will not be endangered upon the child's remaining with or

- 12 -

being returned to the child's parent." § 39.01(77).[7]  Thus, substantial compliance means more than simply completing tasks.  Whether a parent has substantially complied with a case plan "bears directly on the behavior that endangered the child's safety or well-being," N.F. v. Dep't of Children & Family Servs., 82 So. 3d 1188, 1192 (Fla. 2d DCA 2012), such that best interest factors (a) and (b) are interrelated.  This conclusion is further supported by the amendment to section 39.522(3) and its focus on remediation of the circumstances which caused the out-of-home placement.

In considering factor (b), resolution of the circumstances causing the child's dependency, the court summarized the allegations of sexual abuse in the petition for dependency.  It then focused on the statement in the petition that the Father's girlfriend's children were I.N.'s half siblings, finding that the children were not I.N.'s siblings.  This finding was made despite the unrefuted testimony that I.N. resided in the same house with the children while in the Father's custody and referred to the children as her siblings, thus meeting the definition of sibling found in section 39.01(73)(b).  The court also found that the Father was no longer involved with the girlfriend and that there was no evidence that he had another girlfriend.  Presumably the court made these findings to show that the Father could no longer abuse I.N.'s siblings and that no other children were presently in his life for him to abuse in I.N.'s presence.

These findings do not address the behavior that endangered I.N.'s safety or well-being, resulting in her dependency—the Father's alleged sexual abuse of I.N.'s

---

[7]Effective July 1, 2017, subsections (35) through (80) of section 39.01 have been renumbered as subsections (36) through (81), respectively.  Ch. 2017-151, § 2, at 5, Laws of Fla.  Citations to section 39.01 in the remainder of this opinion will be to the 2016 version.

siblings. Nor do the findings address the Father's conduct with respect to I.N. as reported by I.N. to Dr. Frazier—conduct which Dr. Frazier concluded changed I.N.'s status from observer to victim.

The court's order states that the case manager "testified [that] the Father has not shown any behavior to suggest he has not benefitted from services" and that "the Father's Case Plan Tasks addressed the safety issues that brought the child into shelter but [that] 'this Case Plan' does not address 'the problem.' " The court interpreted this testimony, "In other words, the Father benefitted from services." It then noted that " 'this Case Plan' is the only Case Plan the court has to go on" and found that "the Father completed his tasks and benefitted from services thereby resolving the circumstances which caused the child's dependency."

The court has mischaracterized the case manager's testimony. The case manager testified that although case plan tasks are generally designed to address the safety issues that brought the child into shelter, this case plan failed to specifically address the allegations of sexual abuse which caused I.N. to be sheltered. She also testified that this deficiency could be remedied by requiring the Father to undergo a psychosexual evaluation.[8]

Moreover, it is illogical to find that the Father had, in fact, benefitted from services based on the case manager's acknowledgment that she had no evidence that

_____

[8]In fact, at the time of the hearing, a motion to amend the case plan to include a psychosexual evaluation was pending. And while the court took umbrage with what it perceived as an eighteen-month delay in the filing of the motion to amend, the court did not take into account the posture of the Father's criminal case during that timeframe—a fact that directly bore on the Father's unwillingness to complete a psychosexual evaluation at the outset.

the Father had not benefited from services. It is similarly unsound to find that because the Father had completed case plan tasks only tangentially related to the cause of the child's dependency, the circumstances which caused I.N. to be sheltered had been resolved. The court ignored the fact that the Father's case plan did not actually provide the Father with any services to address his alleged sexual abuse of I.N.'s siblings.

The court's order departs from the essential requirements of the law in failing to address and apply the definition of substantial compliance as it relates to the resolution of the circumstances requiring removal of the child. Further, because the court's findings are not supported by competent substantial evidence, the order departs from the essential requirements of the law. The record is devoid of evidence supporting the dependency court's conclusion that the circumstances that caused I.N.'s dependency were resolved.

In considering best interest factor (e), the recommendation of the current custodian, the court noted that the Mother opposed reunification, believed that the Father had sexually abused I.N., and believed that if reunification occurred, I.N. would be revictimized. In rejecting the Mother's recommendation, the court observed that the Mother relied on Dr. Frazier's opinion that I.N. was a victim, not merely a witness, but found that Dr. Frazier's testimony was that I.N. was only a victim of inappropriate sexual behavior, such as showering with the Father and watching his girlfriend and his girlfriend's children touch the Father's genitals in the shower, and not a victim of sexual abuse.

Similarly, under factor (f), the recommendation of the GAL, the court noted that the GAL opposed reunification based upon her belief that contact with the Father

and reunification therapy would be psychologically, emotionally, and physically harmful to I.N. because I.N. had been sexually abused by the Father and had witnessed the Father's sexual abuse of her siblings. The court rejected the GAL's recommendation, again reasoning that the GAL was relying upon Dr. Frazier's testimony to support her position and that Dr. Frazier had not characterized the Father's behavior as sexual abuse but as inappropriate sexual behavior.

The dependency court both misconstrued the evidence and failed to apply the correct law in reaching its asserted reason for discrediting the Mother's and the GAL's recommendations. The court departed from the essential requirements of the law by not applying the statutory definitions of victim, abuse, harm, and sexual abuse of a child within chapter 39. " 'Victim' means any child who has sustained or is threatened with physical, mental, or emotional injury identified in a report involving child abuse, neglect, or abandonment, or child-on-child sexual abuse." § 39.01(80). Section 39.01(2) defines "abuse" as "any willful act or threatened act that results in any physical, mental, or sexual abuse, injury, or harm that causes or is likely to cause the child's physical, mental, or emotional health to be significantly impaired." "Harm" is defined to include "lewd or lascivious acts, as defined in chapter 800," § 39.01(30)(b), which includes lewd or lascivious molestation, lewd or lascivious conduct, and lewd or lascivious exhibition, § 800.04(5), (6), (7), Fla. Stat. (2016). And section 39.01(70) defines "sexual abuse of a child" to include "(e) [t]he intentional masturbation of the perpetrator's genitals in the presence of a child" and "(f) [t]he intentional exposure of the perpetrator's genitals in the presence of a child, or any other sexual act intentionally perpetrated in the presence of a child, if such exposure or sexual act is for the purpose

of sexual arousal or gratification, aggression, degradation, or other similar purpose."

Here, Dr. Frazier's testimony clearly established that I.N. was a victim of sexual abuse under the applicable statutory definitions. Further, the nomenclature used, sexual abuse or inappropriate sexual behavior, does not alter the substance of Dr. Frazier's testimony. Dr. Frazier testified that I.N. told her that the Father had forced her to wash him in the shower and that he had washed her "inside and out." This was conduct that I.N. not only observed her siblings experiencing but which she personally experienced. I.N.'s documented reactions to the Father's conduct suggested to Dr. Frazier that these were not innocent behaviors, and Dr. Frazier found I.N.'s descriptions and demeanor credible. Dr. Frazier's unrefuted testimony was that the Father's behavior caused actual harm to I.N. in the form of PTSD with the Father being the trigger for her symptoms. It was only after undergoing therapy and eliminating contact between I.N. and the Father that I.N.'s symptoms improved. None of the Father's case plan tasks served to remedy the Father's behavior, which caused I.N.'s PTSD. Moreover, Dr. Frazier testified that if the court reunified the Father and I.N., I.N.'s symptoms would return. This evidence established that reunification would harm I.N. and that reunification was not in her best interest.

In discounting the GAL's recommendation, the court also rejected—on the incorrect basis that the children were not siblings—the suggestion that if the Father had abused the other children, I.N. would be at risk of sexual abuse as a sibling. This is also inconsistent with Dr. Silver's testimony, which was not isolated to siblings.

Finally, the court found that because the Father's criminal case had been resolved by a plea of no contest to two counts of child neglect and because he

consented to the dependency without admitting any of the allegations in this case, there had been no finding that the Father had committed sexual abuse of I.N.'s siblings and thus that he posed a danger to I.N.[9]  These findings ignore the evidence that I.N. suffers from PTSD as a result of the Father's conduct and would again suffer those symptoms upon reunification.  See G.V. v. Dep't of Children & Families, 985 So. 2d 1243, 1246 (Fla. 4th DCA 2008) ("A trial court's findings as to the risks to the child or children's safety or mental or emotional health, however, must be based on objectively reasonable grounds."); see also Dep't of Children & Families v. R.A., 980 So. 2d 578, 580 (Fla. 3d DCA 2008) ("[T]here was no competent substantial evidence—by way of reliable expert testimony, compliance with a case plan (which had not yet been formulated) or anything other than the trial court's own plainly insufficient observation and assessment of the mother during her testimony—to support her finding that the mother was 'stable' and thus (presumably) that the danger to the children presented by her mental illness had dissipated.").

After addressing the best interest factors, the court took the position that denying the request for reunification in the absence of a "proposed alternative outcome" would be a de facto termination of the Father's parental rights without the requisite

---

[9]We note that it appears neither the court nor any of the parties considered the Keeping Children Safe Act, § 39.0139(1), in regard to the Father's request for reunification.  Under the Act, where a parent has entered a plea of guilty or nolo contendere to charges under chapter 827, there is a rebuttable presumption of detriment to a child.  § 39.0139(3)(a)(2)(f).  The burden is on the parent seeking reunification to rebut the presumption of detriment before reunification can occur.  § 39.0139(4)(d).  Here, there is no question that the Father pleaded to an enumerated offense under the Act, and because the evidence adduced at the hearing established that I.N. is a victim of sexual abuse, the Act's rebuttable presumption of detriment is applicable.  See § 39.0139(3); J.C., 83 So. 3d at 888.  It does not appear that the dependency court applied the presumption.

support to do so.[10]  The court did not apply or consider the standard set forth in section 39.522(3): "the standard shall be that the safety, well-being, and physical, mental, and emotional health of the child would not be endangered by reunification and that reunification would be in the best interest of the child."  This is a clear departure from the essential requirements of the law.

## III. Conclusion

Because the dependency court failed to apply the standard for reunification, among other applicable statutory provisions, and because its findings under the best interest factors of section 39.621 are not supported by competent substantial evidence, the court departed from the essential requirements of the law in granting the request for reunification, causing irreparable harm to I.N.  We therefore grant the petition for writ of certiorari and quash the order on review.

Petition granted; order quashed.


NORTHCUTT and KELLY, JJ., Concur.

---

[10]Again, we note that a motion to amend the case plan to include the requirement that the Father undergo a psychosexual evaluation was pending at the time the court entered its order.  Consideration of the motion would have obviated the court's concern regarding de facto termination of the Father's parental rights and further informed the court as to the decision before it.  Cf. S.P. v. Dep't of Children & Family Servs., 17 So. 3d 878, 881 (Fla. 1st DCA 2009) ("[T]he requirement to make findings presupposes evidence from which the trial court could make an informed decision.").